UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| JOSEPH P. LITTLEJOHN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 5:14-cv-200 |
| ) | |
| TIMBERQUEST PARK AT MAGIC, LLC, ) | |
| and CORPORATE CHALLENGE, INC., ) | |
| d/b/a ADVENTURE MÁS, ) | |
| ) | |
| Defendants. ) | |

**AMENDED OPINION AND ORDER RE:
DEFENDANT'S AND PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT
(Docs. 44, 46 & 52)**

Plaintiff Joseph Littlejohn was severely injured while participating in an adventure zip-line course at Magic Mountain Ski Area in Londonderry, Vermont on October 5, 2013. He claims that defendants negligently designed, constructed, and operated the course, leading to the accident which caused his injuries. Both Littlejohn and defendant TimberQuest Park at Magic, LLC (TimberQuest) have filed motions for summary judgment, seeking a determination regarding the enforceability of a liability waiver and arbitration provision signed by Littlejohn prior to participating in the course.

I.   **Facts**

The following facts are undisputed for the purposes of summary judgment, except where otherwise noted. On October 5, 2013, Littlejohn was injured while traversing a self-guided aerial adventure course at Magic Mountain. At the time of his injury, Littlejohn was seventy-six years old. He had never participated in an adventure course before. Defendant TimberQuest operated the adventure course at the time of the incident. Defendant Corporate Challenge, Inc. d/b/a Adventure Más designed and constructed the course.

The adventure course consists of a series of rope bridges, ladders, cargo nets and zip lines placed between elevated platforms constructed around trees and poles. Participants gradually

1

gain elevation by climbing and traversing a series of uphill course elements and then return to the bottom of the course by sliding down a series of zip lines. Participants wear a climbing harness equipped with a "smart belay" system that is meant to keep them attached at all times to both a safety cable and a zip line cable. The "smart belay" system is intended to ensure that the participant is always attached to at least one of the cables.

The trees and poles which support the course platforms are stabilized by guy wires. These guy wires are anchored at one end to the tree or pole where a course platform is located and at the other end to another nearby tree or the ground.

On the day he visited, Littlejohn was equipped with a climbing harness and was instructed how to use the smart belay system's dual carabiners. According to Littlejohn, he was not warned that there were guy wires on the course in addition to safety cables and zip line cables or that he should avoid clipping onto the guy wires.

Littlejohn climbed through the uphill course elements and began to descend on the zip lines. As he was preparing to descend one of the sections of the course, he mistook a guy wire for the zip line cable. He attached his smart belay to the guy wire and slid down the guy wire. At the bottom he ran into the tree which anchored the other end of the guy wire. He suffered severe injuries.

Littlejohn's friend Miki Conn had purchased their tickets for the adventure course through TimberQuest's website on September 12, 2013.

According to Littlejohn, TimberQuest's website does not alert customers that they will be required to sign a liability waiver prior to participating in the adventure course. Littlejohn alleges that neither Conn nor he was aware that they would have to sign a liability waiver until they arrived at TimberQuest three weeks later. At oral argument, counsel for both sides cleared up some confusion on this point: there is a notice on the website concerning the liability waiver, but it appears only at the point of purchase by the customer. A company other than TimberQuest provides the ticketing, reservation and credit card services. That company's website includes a warning to customers that they will be required to sign a liability waiver before they enter the course. Since Littlejohn's counsel did not actually buy a ticket, he did not encounter this information in preparing his motion for summary judgment.

2

When they arrived at TimberQuest on October 5, Littlejohn and Conn were each presented with a document entitled "Release of Liability, Waiver of Claims, Indemnification, and Arbitration Agreement." The agreement was presented to them in digital format on an electronic device and they were instructed to read and sign it electronically.

The agreement stated that the participant agreed to "waive all claims" and "assume all risks" arising from participating in programs at the adventure course, including claims arising from negligent acts or conduct of TimberQuest, and further agreed to release and indemnify TimberQuest from liability for any injury suffered by the participant while using the course. (Doc. 44-3 at 2.) Under the heading "Arbitration," the agreement stated that:

> The Participant . . . hereby agrees to submit any dispute arising from participation in the Programs, for which Participant intends to seek damages in excess of $75,000.00, to binding arbitration. . . . In the event that Participant . . . files a lawsuit in any court relating to, and/or arising from, Participant's participation in the Programs, Participant . . . by signing this document, stipulate[s] to a cap on Participant's damages of $75,000.00, exclusive of interest and costs. As a threshold matter, the Panel, or the Court (if a lawsuit is filed), shall confirm whether the Waiver and Release contained in this Agreement are enforceable under applicable law. (*Id.*)

The agreement contains a severability clause stating that if any provision is invalidated, the remainder of the agreement will continue to be binding. Littlejohn signed the agreement prior to participating in the course.

## II.     Analysis

On March 27, 2015, TimberQuest filed a motion for partial summary judgment seeking a declaration that the $75,000 damages cap contained in the arbitration clause is enforceable against Littlejohn. (Doc. 44.) Littlejohn opposed the motion on the grounds that the damages cap violates public policy and is procedurally and substantively unconscionable. (Doc. 45.) Littlejohn filed a cross-motion for summary judgment seeking to have the waiver, assumption of risk, release and indemnity provisions of the agreement declared void and unenforceable as well. (Doc. 46.) In response, TimberQuest filed a cross-motion for summary judgment arguing that the agreement is enforceable and all of Littlejohn's claims should be dismissed because he released TimberQuest from liability for negligence by signing the agreement. (Doc. 52.)

A.  **Standard of Review**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

B.  **Enforceability of Provisions Regarding Waiver of Claims, Release, Assumption of Risks from Negligence, and Indemnity**

The enforceability of a contract provision providing for the waiver of a customer's claims for negligence arising out of recreational activities is a matter of Vermont law. It is governed by four Vermont Supreme Court cases which seek to define the circumstances under which a business may contract out of liability for its own negligent conduct.

The leading case remains *Dalury v. S-K-I, Ltd.*, 670 A.2d 795 (Vt. 1995), in which the Vermont Supreme Court rejected the exculpatory language in ski tickets issued by the Killington ski resort to its customers. The court reviewed the criteria announced by the California Supreme Court in *Tunkl v. Regents of University of California*, 383 P.2d 441 (Cal. 1963),[1] and identified the longstanding rule that business owners are responsible for the safety of their premises as the

---

[1] The *Tunkl* decision identified the following list of characteristics which may violate the public interest:

> It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Tunkl*, 383 P.2d at 445-46.

4

basis on which to strike the exculpatory provisions in the ticket. *Dalury*, 670 A.2d at 799. The decision recognized that the ski area—and not the skiers—had the expertise and opportunity to foresee and control hazards and to reduce negligent conduct by its employees.

The *Dalury* decision did not depend upon a determination that skiing was an essential industry or service. "Whether or not [the ski resort] provide[s] an essential public service does not resolve the public policy question in the recreational sports context." *Id*. Skiing is not like taking a cab or visiting the hospital—services for which there may be no substitute and which are necessary to everyday life. Rather, the decision rests upon two related principles: the business is open to the general public without regard to special training or ability and the premises owner is in the best position to assure the safety of visitors. These principles have remained unchanged in the cases which have followed *Dalury*.

The first was *Spencer v. Killington, Ltd.*, 702 A.2d 35, 37 (Vt. 1997), in which the exculpatory language used as a condition for entering an amateur ski race was not enforced for the same reasons the court had expressed two years before in *Dalury*. The dissent identified the fault line in the doctrine:

> There is a significant difference between the expectations of the general public, which has a right to assume reasonable care on the part of the ski area operator, and a ski racer who consciously undertakes risks that he or she knows may strain or exceed the tolerance of any safety system.

*Id*. at 38 (Allen, C.J., dissenting). Over time this distinction between members of the general public and people engaging in high-risk sports would become more marked.

In *Thompson v. Hi Tech Motor Sports, Inc.*, 945 A.2d 368, 372 (Vt. 2008), the Vermont Supreme Court upheld the enforceability of a liability waiver on public policy grounds.[2] The case concerned a customer at a motorcycle dealership who was injured on her test ride. The court distinguished the policy concerns at issue in *Dalury*, explaining that "whereas public policy places the burden of maintaining safe premises on a landowner, public policy concerning motorcycle safety places the burden of safe driving on the operator of the motorcycle." *Id*. The

---

[2] Although the waiver provision was held not to be void on public policy grounds, the court concluded that the provision failed release the defendant from liability for negligence because the language was ambiguous. *Id*. at 375.

court also determined that motorcycle dealerships do not provide a necessary service. *Id.* at 373. In this respect, the case followed *Dalury*. In contrast to skiers, however, the customer operated the motorcycle on the public road. There were no business premises relevant to the case. The decision also compared motorcyclists to customers of skydive companies, underwater diving schools, and mountain guiding services—high-risk sports for people with special skills. *Id.* Further, unlike the ski area in *Dalury*, the motorcycle dealership only allowed licensed motorcycle drivers with sufficient experience and training to take its motorcycles out for a ride. *Id.*

Finally, in *Provoncha v. Vermont Motorcross Association*, 974 A.2d 1261, 1267 (Vt. 2009), the exculpatory language for an off-road motorcycle racing club was enforced because the activities were "neither of great importance to the public nor open to the public at large." The majority distinguished the case from *Dalury* because the premises where the accident occurred was a private racetrack open only to members of a small club of 300 members. *Id.* The general public was not permitted to ride. The decision also drew a parallel to the enforcement of similar provisions in cases involving parachute jumping, stock car racing, scuba diving, and mountaineering—all sports which were said not to be matters of legitimate public interest. *Id.*

All four cases call for a flexible case-specific analysis of the factors originally identified in the *Dalury* decision. Of these, the least significant is whether a recreational activity is necessary to society. Few of them are. Not surprisingly, skiing and motorcycle riding—the two activities which generated the four decisions—were both found to be inessential to daily life. The factors which were most consistently applied were whether the defendant was in control of the location where the injury occurred and whether these premises were open to the general public. When these factors are present—as in *Dalury* and *Spencer*—the exculpatory clauses are not enforced. When these factors are absent—as in *Thompson* and *Provoncha*—the exculpatory clauses are likely to be enforced.

The court is not persuaded by TimberQuest's argument that the *Dalury* case is on its last legs and will not survive much longer. Although the result was different in *Thompson* and *Provoncha*, neither case suggested that any member of the Vermont Supreme Court sought to discard the rule announced in *Dalury*. Instead, the debate from both sides concerned the differences between activities open to the general public and the more risky pursuits of riding

6

motorcycles, skydiving, scuba diving and mountaineering, all of which generally take place in settings that are not under the control of the business operators.

The remaining factors set out in *Tunkl* had no particular application in *Dalury* and the subsequent cases and have little in this case either. These include whether the activity is suitable for public regulation, whether the business enjoys unequal bargaining strength as a result of its essential nature, and whether the contract is one of adhesion. *Tunkl*, 383 P.2d at 445-46. Although ski lifts are regulated, *see* 31 V.S.A. §§ 701-12, the downhill experience is not. Neither are rope courses or motorcycle races. Although a person who sought to negotiate the terms of his ski ticket or his adventure course ticket might not be admitted, in the absence of any necessity the customer can always walk away, which gives him or her some degree of economic strength. And all of the contracts involved in these cases—whether enforced or not—were preprinted contracts of adhesion which appeared on tickets and entrance forms.

Before leaving the *Dalury* factors, the court must consider one final factor which is heavily relied upon by the defendants. This factor arises from the language in *Dalury* that thousands of skiers visit Killington every day, 670 A.2d at 799, while only a few come to TimberQuest's zip-line course. In the course of discovery, TimberQuest's owner estimated that he has 1000 visitors a season—the number he put down on his worker's compensation insurance application. (Doc. 52-6 at 3.) He does not actually have a real count. Assuming a 100-day season, this amounts to ten visitors each day or one or two visitors per hour. (The estimate may not be very reliable, but it is the only number in the record.) The defense argues that a small business which is open to the public should receive treatment which is different from a large business. Although the court has reviewed the language in the *Dalury* decision about the thousands of daily visitors, the court is not convinced that the size of the business alone plays a significant role in whether the exculpatory clause in the ticket should be enforced.

As this discussion indicates, the court is satisfied that attending a zip-line program is more like visiting a ski area than like taking part in a specialized high-risk sport which requires skill and experience. Like the ski area, the zip-line sells tickets to all comers (subject to age and weight restrictions not relevant here.) It requires no prior training. As an excerpt from the website furnished by defendant indicates, this is a recreational activity open to all without restriction:

7

> TimberQuest is an exhilarating treetop adventure course for the entire family. We have over 20 zip lines and 75 challenges of varying difficulty. Challenges include rope bridges, ladders, cargo nets, and even a course for younger children. Customers are always clipped into a safety guide wire and friendly trained staff provide[] assistance from the ground. (Doc. 52-4 at 5.)

The course is designed and controlled by defendants. There is no indication in the record that anyone needs to learn to use the course beyond an initial training class offered at the park. (Doc. 52-4 at 14.) It is even more open to the public than skiing, which typically involves beginner's lessons and some degree of acquired skill. The zip-line course requires no such training or skill.

This court's decision to invalidate the exculpatory clause on public policy grounds falls within the principles laid down by the Vermont Supreme Court in *Dalury* and the later cases. It recognizes the longstanding rule that business owners are responsible for the safety of their premises. It also recognizes the expectation that a recreational activity which is open to the general public will be reasonably safe for use by all users. In other words, the business cannot contract out of liability for negligence in the design, maintenance and operation of its business premises.

For these reasons, the court will not enforce the exculpatory language on the public policy grounds first identified in *Dalury*.

### C. Assumption of Risk and Indemnity

Littlejohn seeks to invalidate the assumption-of-risk provision in the agreement. The court has already concluded that the first sentence of this provision, which states that by signing the agreement the participant agrees to assume all risks of participating in the adventure course including those caused by TimberQuest's negligence, is invalid.

However, Littlejohn's argument does not specifically address the second sentence of this provision, which states that "[t]he Participant . . . understand[s] that there are inherent risks of participating in the Programs and using the Equipment, which may be both foreseen and unforeseen and include serious physical injury and death." (Doc. 44-3 at 2.) Under Vermont law, "a person who takes part in any sport accepts as a matter of law the dangers that inhere therein insofar as they are obvious and necessary." 12 V.S.A. § 1037. This defense remains viable even if the defendant's exculpatory agreement is found to be void as contrary to public

8

policy. *Spencer*, 702 A.2d at 38. This provision of the agreement remains valid and TimberQuest is free to assert assumption of risk as a defense.

There is no third-party claim against TimberQuest for indemnity. The court does not address this issue.

### D. Enforceability of Arbitration Clause

After disposing of the exculpatory clause, the court considers the enforceability of the arbitration clause.

As drafted, the clause works in the following way: a claimant seeking damages in excess of $75,000 is required to proceed to binding arbitration. Claims of $75,000 or less are not subject to arbitration. The arbitration panel is composed of three members. Each side chooses one member. The two members then select the third, who must be "an officer or director of any entity that operates an aerial adventure park with zip lines in the United States." (Doc. 52-4 at 31.) If the first two panel members cannot agree on a third, a judge within the District of Vermont shall appoint the third member "utilizing the selection criteria for the neutral as set forth above." (*Id.*)

Littlejohn challenges this provision on the following grounds. First, he argues that the provision is procedurally unconscionable because it is contained in small print in a contract of adhesion that was presented to him well after he paid for his tickets. Second, he maintains that the arbitration clause is substantively unconscionable because the third arbitrator is required to be an officer or director of another company that operates a zip-line course, thus tilting the arbitration panel in favor of TimberQuest. Finally, he argues that the arbitration clause lacks mutuality because it has no application to a claim by TimberQuest against a customer.

The first issue is what law governs this dispute. Both the Federal Arbitration Act, 9 U.S.C. §§ 1-16, and the Vermont Arbitration Act, 12 V.S.A. §§ 5651-5681, apply to this arbitration agreement which was formed in Vermont and which the defendant seeks to enforce in Vermont. When the two statutes differ, the federal provision preempts state law. *See David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd.* (London), 923 F.2d 245, 249-50 (2d Cir. 1991) (holding that FAA preempts VAA); *Little v. Allstate Ins. Co.*, 705 A.2d 538, 540 (Vt. 1997)

9

(same). The claims of unconscionability raised by Littlejohn, however, are matters arising under state substantive law and are enforced in the same way under either the federal or state arbitration acts. *See* 9 U.S.C. § 2 (stating agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"); *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1746 (2011) (explaining that final phrase of § 2 provides that agreements to arbitrate may be invalidated by generally applicable state-law contract defenses such as fraud, duress, or unconscionability). In considering issues of both procedural unconscionability relating to the form of the contract to arbitrate and substantive unconscionability relating to its content, the court is guided by Vermont decisional law where it is available.

Littlejohn's claim of procedural unconscionability is unconvincing. Unlike the provisions at issue in *Glassford v. BrickKicker*, 35 A.3d 1044, 1053 (Vt. 2011), the arbitration provision is on the middle of the page, directly under the waiver provisions and is prefaced with a conspicuous header stating "Arbitration." The print is normal-sized. The customer's signature line is on the second page, giving him an opportunity to read the text before signing. Although the agreement was presented to Littlejohn as a preprinted contract with no real opportunity to negotiate the terms, he could have declined to participate in the course and requested his money back if he objected to the arbitration provision. This was not a contract for a necessary service such as home inspection where the weaker party was "at the mercy" of the drafter. *See id.* at 1052. As the Vermont Supreme Court has repeatedly pointed out, "unequal bargaining power alone will not nullify a contract." *Maglin v. Tschannerl*, 800 A.2d 486, 490 (Vt. 2002).

Littlejohn also argues that the arbitration agreement was procedurally unconscionable because he was presented with it upon arrival at TimberQuest, more than three weeks after his companion paid for the tickets, and was not warned in advance that he would have to sign it. This argument was based on his attorney's mistaken belief that the TimberQuest website did not warn customers prior to payment that they would be required to sign the agreement. However, at oral argument the parties agreed that on the payment page, under Terms and Conditions/Liability Waiver, the website displayed the following message: "All participants MUST sign a release and waiver of claims/indemnification agreement at check-in." Customers were required to check a box stating "I agree" in order to purchase their tickets. This provided sufficient constructive

warning to Littlejohn through his friend who actually bought the tickets that he would have to sign the agreement prior to participating in the course. Further, this was not the first time that Littlejohn had encountered a recreational liability agreement. As he testified at his deposition, "[w]e did sign a release, but that's standard to me" since he was often required to sign similar forms at ski areas. (Doc. 44-4 at 4.)

Turning to Littlejohn's argument of substantive unconscionability, it is obvious that the requirement that the "neutral arbitrator" be drawn from the ranks of the zip-line industry is unfair. It is no more than a requirement that the arbitration be conducted among friends—or at least people who share the same concerns about defending against claims by injured customers. Courts have long refused to enforce arbitration clauses which call for the appointment of panel members who are likely to harbor a bias in favor of one side or another. *See Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 202 (2d. Cir. 1998) (discussing possibility of institutional bias due to industry influence over selection of arbitration panel); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 995 F. Supp. 190, 209 (D. Mass. 1998) (listing cases). TimberQuest's suggestion that a member of the same industry will be biased *against* TimberQuest because he or she will be a competitor willing to do harm to a rival company demonstrates only that the arbitration clause requires the choice of someone likely to hold some form of bias or self-interest—maybe for TimberQuest and maybe against.

The contract between the parties includes a severability clause: "To the extent that any portion of this Agreement is deemed to be invalid under the law of the applicable jurisdiction, the remaining portions of the Agreement shall remain binding and available for use by the Host and its counsel in any proceeding." (Doc. 52-4 at 32.) Setting aside for a moment the one-sided nature of this clause—"available for use by the Host and its counsel"—the severability clause authorizes the court to reform the arbitration provision by striking the requirement that the neutral be drawn from the zip-line industry and providing for the more conventional selection of a genuinely neutral arbitrator by the other two panel members with provision for selection of a third by the court in the event of a deadlock.

The court will enforce the severability clause to strike the provision requiring the choice of a "neutral" arbitrator who is likely to hold a bias in favor of the zip-line industry. The remaining question is the issue of mutuality.

11

Some courts have found arbitration clauses in contracts of adhesion that required one party to go to arbitration but imposed no similar obligation on the other party to be unconscionable. *See, e.g., Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 170-71 (5th Cir. 2004) (holding arbitration clause in cellular telephone customer service agreement was unconscionable under Louisiana law because it required customer but not provider to arbitrate all claims); *Abramson v. Juniper Networks, Inc.*, 9 Cal. Rptr. 3d 422, 437 (Cal. Ct. App. 2004) ("When only the weaker party's claims are subject to arbitration, and there is no reasonable justification for that lack of symmetry, the agreement lacks the requisite degree of mutuality.").

However, this appears to be a minority position. The Second Circuit has rejected the argument that an arbitration clause is void for lack of mutuality where it only requires one party to submit all claims to arbitration. In *Doctor's Associates, Inc. v. Distajo*, 66 F.3d 438 (2d Cir. 1995), the court held that an arbitration clause in a franchise agreement was not void for lack of mutuality under Connecticut law, even though the clause required the franchisees to submit all controversies to arbitration while reserving to the franchisor the right to seek summary eviction against the franchisees. The court explained that mutuality was "not an issue." *Id.* at 451. Under modern contract law, the doctrine of "mutuality of obligation," which requires that a contract be based on reciprocal promises, is no longer required so long as the agreement as a whole is supported by consideration. *Id.* (citing Restatement (Second) of Contracts § 79 (1979)). The court rejected the idea that the arbitration clause must be considered as a separate contract within a contract, supported by its own consideration. *Id.* at 452. Likewise, the court held that the doctrine of "mutuality of remedy," which provides that a "plaintiff shall not get specific enforcement unless the defendant could also have obtained it," is also defunct and did not support the franchisees' argument. *Id.* at 453 (citing Restatement (Second) of Contracts § 363 cmt. c. (1979)). Because the agreement to arbitrate was part of a larger contract which was supported by consideration, it did not fail for lack of mutuality.

Other circuits have reached similar conclusions. *See Soto v. State Indus. Prods., Inc.*, 642 F.3d 67, 77 (1st Cir. 2011) (applying Puerto Rico law); *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999) (applying Pennsylvania law); *Barker v. Golf U.S.A., Inc.*, 154 F.3d 788, 791 (8th Cir. 1998) (applying Oklahoma law); *see also Circuit City Stores, Inc. v. Najd*, 294

F.3d 1104, 1108 (9th Cir. 2002) (applying California law and holding that employer's promise to be bound by arbitration process was sufficient consideration for employee's agreement to arbitrate); *Michalski v. Circuit City Stores, Inc.*, 177 F.3d 634, 636 (7th Cir. 1999) (applying Wisconsin law and reaching same conclusion as *Najd*).

Vermont courts have not specifically addressed whether an arbitration clause may be void for lack of mutuality. Vermont contract law does not otherwise require parties to an agreement to have equivalent obligations for the agreement to be valid. *See H.P. Hood & Sons v. Heins*, 205 A.2d 561, 566 (Vt. 1964) ("[T]here is no requirement that the option of one promisor must be coextensive with the privilege of termination extended to the counter-promisor."). "Even if one party has options not provided to the other party . . . the contract is not per se unsupported by consideration. Rather, a contract is incomplete only if one party's obligations are so attenuated as to render consideration merely illusory." *Petition of Dep't of Pub. Serv.*, 596 A.2d 1303, 1309 (Vt. 1991) (Morse, J., dissenting); Restatement (Second) of Contracts § 79 (1981) ("If the requirement of consideration is met, there is no additional requirement of . . . 'mutuality of obligation.'"). The FAA would preempt Vermont from imposing such a requirement only in the case of arbitration provisions. *See AT&T Mobility LLC*, 131 S. Ct. at 1741. Given that Vermont law strongly favors arbitration, *Union Sch. Dist. No. 45 v. Wright & Morrissey, Inc.*, 945 A.2d 348, 354 (Vt. 2007), the court concludes that mutuality is not required in order for the arbitration provision to be enforceable.

Littlejohn argues that the agreement was unsupported by consideration because he was forced to sign it weeks after he had paid for the tickets. This argument is without merit. "[A]ny performance which is bargained for is consideration." Restatement (Second) of Contracts § 72 (1981). TimberQuest's performance in this case was allowing Littlejohn to use its adventure zip-line course. In exchange, Littlejohn's friend paid for their tickets. Upon arrival at the park, he promised that he would submit his claims to arbitration or agree to limit his recovery in court to $75,000. As noted above, the payment page required Littlejohn to agree to sign the agreement prior to participating in the course. "In other words, defendant's offer of services did not extend to anyone who did not sign the Agreement." *Mero v. City Segway Tours of Washington DC, LLC*, 962 F. Supp. 2d 92, 103 (D.D.C. 2013) (holding that liability waiver signed by plaintiff who paid for Segway tour in advance was supported by consideration in form of defendant's

13

provision of Segway and guided tour where confirmation email warned that he would have to sign liability waiver prior to tour). Thus, Littlejohn's promise was supported by consideration.

As reformed by the court, the arbitration provision is valid. Under the agreement, there is no cap on damages if the participant chooses to go to arbitration. If the participant chooses to go to court, he or she agrees to seek $75,000 or less in damages. This court only has jurisdiction over a diversity case if the amount in controversy "exceeds the sum or value of $75,000." 28 U.S.C. § 1332(a). This provision is strictly construed, and does not extend jurisdiction to a claim for an even $75,000. *Salis v. Am. Export Lines*, 331 F. App'x 811, 814 (2d Cir. 2009); *Matherson v. Long Island State Park Comm'n*, 442 F.2d 566, 568 (2d Cir. 1971). Thus, Littlejohn may not bring suit in this court. The court accordingly dismisses plaintiff's negligence claims for lack of subject matter jurisdiction and without prejudice to plaintiff's right to demand arbitration.

### III. Conclusion

For the reasons stated above, defendant TimberQuest's motion for partial summary judgment (Doc. 44) is GRANTED. TimberQuest's cross-motion for summary judgment dismissing all claims (Doc. 52) is DENIED. Plaintiff's cross-motion for summary judgment (Doc. 46) is GRANTED in part and DENIED in part. Plaintiff's claims against TimberQuest are dismissed for lack of subject matter jurisdiction without prejudice to plaintiff's right to demand arbitration. This decision replaces the earlier order issued on July 21, 2015, and the judgment of the same date is vacated.

Plaintiff's claims against defendant Corporate Challenge remain pending because Corporate Challenge was not a party to the arbitration agreement. The indemnity claim by TimberQuest against Corporate Challenge is dismissed without prejudice because TimberQuest is no longer a party in this case.

Dated at Rutland, in the District of Vermont, this 21st day of July, 2015.

Geoffrey W. Crawford, Judge
United States District Court